1
2
3
4
5
6
7
8

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

| | | |
|---|---|---|
| MITIA LYNN LANSBURG-COCHRAN, | ) | Case No. CV 13-5173-AS |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PROCEEDINGS

        On July 25, 2013, Plaintiff filed a Complaint seeking review of the denial of her application for Supplemental Security Income.  (Docket Entry No. 3).  The parties have consented to proceed before the undersigned United States Magistrate Judge.  (Docket Entry Nos. 13-14).  On November 7, 2013, Defendant filed an Answer along with the Administrative Record ("AR").  (Docket Entry Nos. 13-14).  On December 23, 2013 Plaintiff filed a Brief in Support of the Complaint ("Plaintiff's Brief").  (Docket Entry No. 21).  On January 22, 2014, Defendant filed a Brief in Support of the Answer ("Defendant's Brief").

1  (Docket Entry No. 22).  On January 29, 2014, Plaintiff filed a Reply to
2  Defendant's Brief ("Plaintiff's Reply").  (Docket Entry No. 23).

3

4      The Court has taken this matter under submission without oral
5  argument.  See C.D. Cal. L.R. 7-15; "Case Management Order Including
6  Mandatory Settlement Conference Procedures," filed July 29, 2013 (Docket
7  Entry No. 7).

8

9                **BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

10

11     On September 23, 2008, Plaintiff, formerly employed as a
12 bookkeeper/general merchandise sales representative (see AR 50, 52, 86,
13 180), filed an application for Supplemental Security Income, alleging a
14 disability since September 23, 2008.  (See AR 66, 74, 78, 158-59).  On
15 June 21, 2010, the Administrative Law Judge ("ALJ"), Sally C. Reason,
16 heard testimony from Plaintiff, medical expert Betty Bourden, and
17 vocational expert Gregory Jones.  (See AR 41-64).  On July 8, 2010, the
18 ALJ issued a decision denying Plaintiff's application.  (See AR 78-8).
19 After determining that Plaintiff had severe impairments -- asthma and a
20 mood disorder (AR 80-81)[1] --, the ALJ found that Plaintiff had the
21 residual functional capacity ("RFC")[2] to "perform a full range of work
22 at all exertional levels with the following nonexertional limitations:
23 avoidance of concentrated exposure to dust, fumes, odors, etc.; no more
24 than limited public contact; and can do simple, unskilled tasks.  (AR

25 _____

26      [1]    The ALJ found that Plaintiff had several non-severe
   impairments -- acute renal failure secondary to diuretics and
27 hypertensive urgency, hypertension, acute gastritis, irritable bowel
   syndrome, and a heart murmur.  (AR 80-81).

28      [2]    A Residual Functional Capacity is what a claimant can still
   do despite existing exertional and nonexertional limitations.  See 20
   C.F.R. § 404.1545(a)(1).

82).  After finding that Plaintiff is unable to perform past relevant work as a general merchandise sales representative (AR 86), the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, and therefore found that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 87-88).

Plaintiff requested that the Appeals Council review the ALJ's decision.  (AR 37).  The request was denied on May 24, 2012.  (AR 13-19).  The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision.  See 42 U.S.C. §§ 405(g), 1383(c).

## PLAINTIFF'S CONTENTIONS

Plaintiff alleges that the ALJ erred in failing to properly: (1) evaluate the opinions of Plaintiff's treating physicians; and (2) determine Plaintiff's credibility.  (See Plaintiff's Brief at 3-9; Plaintiff's Reply at 1-4).

## DISCUSSION

## A.   The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff asserts that the ALJ failed to properly assess Plaintiff's credibility.  (See Plaintiff's Brief at 7-9; Plaintiff's Reply at 3-4). Defendant asserts that the ALJ properly evaluated Plaintiff's credibility.  (See Defendant's Brief at 8-9).

Plaintiff made the following statements in a Function Report-Adult dated October 16, 2008:

(1) she lives at home with friends; (2) with respect to daily activities, she wakes up, has coffee, takes her pills, yells at her girls to go to school, takes a nap, has lunch, takes more pills, asks her older daughter to pick up her sister from school, asks her older daughter to go to the store, either makes dinner or has her older daughter make dinner, takes more pills, watches television, and goes to bed; if she feels good, she washes her face, combs her hair and brushes her teeth, if she does not feel good, she just watches television or sits in a quiet place; (3) she takes care of her two daughters (she feeds them); (4) she does not take care of pets (her daughters do); (5) her daughters care for pets, clean the house, and sometimes her older daughter makes dinner; (6) she used to be able, but is no longer able, to care for her house and daughters, to work and to go shopping; (7) with respect to personal care, she is able to dress (but stays in her pajamas most of the time), to bathe (but sometimes goes weeks without bathing), to care for hair (her daughters braid it), to shave her legs (rarely), to brush her teeth (but sometimes goes for a week without brushing or flossing); but she is not able to feed herself or use the toilet, and she needs special reminders to take care of her personal needs and grooming and to take medicine (she forgets); (8) she is able to make sandwiches and frozen food a couple times a week, which takes 30 minutes to 3 hours (her daughters make real food); she used

4

to make homemade foods, such as salad; (9) she does one household chore -- laundry -- once or twice a month; it takes her all day, and she needs a reminder to do it (she cannot do other house or yard work because she has allergies and she gets sick and is usually too tired); (10) she does not go outside often because she has difficulty in crowded places and just wants to sit in her chair; when she goes out, her daughter drives her (she drives but only when necessary); (11) she shops by computer for everything but food; she does not shop often because she is poor and it takes a long time; (12) she does not pay bills and does not handle a savings account or use checkbook/money orders, but she can count (she does not have a bank account, but she goes on spending sprees to feel better); she used to have checking and savings accounts prior to her conditions; (13) her interests are watching television (which she does every day, but never did before due to lack of time); (14) she spends time with others on the phone (she tries to call her mom at least one time a week); she does not go to any places regularly, and she avoids other people because she does not want to deal with their problems; (15) her conditions affect her squatting, bending, reaching and kneeling (she falls over doing them), talking, hearing, stair-climbing (she gets dizzy), seeing (she gets blurred vision), memory (she cannot remember short-term), completing tasks (she gets sidetracked), concentration (1/4 of her normal), understanding and following instructions (1/2 of her normal); (16) she does not know how far she can walk before needing to rest; (17) she cannot pay attention for long because her mind

wanders; (18) she does not finish what she starts because she gets distracted; (19) she is okay at following written instructions (but gets angry and confused when she is distracted); she is not good at following spoken instructions; (20) she does not get along with authority figures (she panics); she does not handle stress well (she yells and has to leave the room); she does not handle changes in routine well; (21) her unusual fears include a fear of being crazy, a fear of large places; and a fear of a place with a lot of people; and (22) she uses a breathing machine (nebulizer), which was prescribed in March/April 2008.

(See AR 223-30).

At the hearing, Plaintiff testified as follows:

She completed high school.  She last worked in 2006, selling on the sales floor and performing "sort of managerial work."  She was only able to work for a few months because of too much stress and problems with dealing with the public (she does not deal with people who get upset or aggressive).  From 1988 to approximately 1998, she owned a billiard supply company which apparently was shut down based on the failure to pay taxes to the Internal Revenue Service.  That event caused her to have a nervous breakdown.  She was not hospitalized, but her doctor told her she was over-stressed.  (See AR 50-54).

Following the 1998 event, she got some treatment, but she did not really improve.  She tried to go back to work, but she was not able to do it.  She did not think about finding a job in an environment where she would be away from people because she was not trained to do anything else, she did not know what else she could do, and she has problems thinking, remembering, concentrating, and gets frustrated.   With respect to her concentration, if she tries to read something, she gets to a point where she cannot see or think, so she becomes frustrated and has to take a pill which makes her fall sleep. (See AR 54-55).

When she worked in 2006, she got along with her co-workers and supervisors.  She gets along with her family.  She has one friend only, and she and her friend presently are not friends.  (See AR 55-56).

When she gets depressed, she sits at home on the couch.  When her daughters talk over everything and turn on the television, watching everything gets too clouded and complicated, and she has to go to her room and turn out the lights.  She gets anxiety attacks almost every day.  Sometimes she bursts out in anger and starts screaming.  She does not go to crowds of people because she gets confused and lost.  She also goes from being compulsive (i.e., constant flossing, brushing her teeth) to not doing anything (i.e., showering once a week, wearing pajamas for a week).  She has more bad

days than good days; a typical bad day consists of a lot of confusion, anxiety and noise.  (See AR 56-58).

Her daughters (20 and 17 years old) do the house work (vacuuming, mopping, grocery shopping).  She does not drive unless she has to (i.e., picking up her daughter from school if her daughter misses the bus).  If she takes medication, she cannot drive or function.  (See AR 58-59).

Her medication causes her to be a little lethargic and not be able to focus.  She always lies down during the day.  She is not able to estimate how much time she spends lying down during the day.  She can remember things from a long time ago, but not from a short time ago.  (See AR 59).

After briefly summarizing Plaintiff's testimony, as well as the statements of Plaintiff's friend in a Third Party Function Report (AR 82), the ALJ concluded:  "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  (Id.).

The ALJ then provided the following assessment of Plaintiff's credibility:

To start, the claimant's allegations that she is unable to sustain the demands of competitive employment due to asthma and depression are less than fully credible in light of the medical evidence. The medical record establishes the claimant has a history of asthma that has been primarily treated with nebulizer therapy. While the claimant has experienced asthma exacerbations, the evidence shows she has never been hospitalized. Additionally, although her asthma worsened in November 2008 and required a regimen of steroid therapy, there is no mention of any asthma related complaints until April 2009 (Exhibits 2F/9 & 14F/15). Subsequent to that episode, the claimant's asthma has been fairly controlled with no changes in her medication and only one reported exacerbation in January 2010 due to sinusitis (Exhibit 22F/9). By March 2010, the claimant's asthma was noted to be under "good control" (Exhibit 22F/9). Nevertheless, given the claimant's generally credible allegations and testimony, the undersigned has included limitations in the residual functional capacity finding contained herein which are consistent with the claimant's alleged limitations.

With regards to the claimant's depressive disorder, the record reveals that while the claimant was intermittently prescribed antidepressants by her general practitioner, she did not seek treatment with a mental specialist until August 2008 when she saw Stephen Simonian, M.D. (Exhibit 3F). However, the undersigned notes the claimant has not sought an individual therapist. While Dr. Simonian noted on mental

examination that the claimant was labile with occasional crying spells, all other findings were unremarkable including intact memory of remote and recent events (Exhibit 3F/5). The claimant was started on several mood stabilizers and by October 2008, reported that the medications were "helpful" and that she was "generally doing good" (Exhibit 3F/8). Concurrently, Dr. Simonian completed a medical source statement where he noted the claimant was unlimited in her ability to understand, remember and carry out simple instructions; that she was not significantly limited in understanding, remembering and carrying out complex instructions; and that she was somewhat impaired in her ability to maintain concentration, attention, and persistence, perform activities within a schedule, complete a normal workday and workweek, and respond appropriately to changes in work setting (Exhibit 4F). In November 2008, Dr. Simonian asserted the claimant's general condition was stable (Exhibit 3F/8). In December 2008, the claimant reported to Dr. Simonian that her current medication was "helpful and keeps her anger and impulsive behavior in check" (Exhibit 11F/3).

At the request of the State Agency, a psychiatric consultation was performed on December 16, 2008 by Edward Ritvo, M.D., where the claimant reported feeling depressed and having "anger issues" (Exhibit 6F/3). She denied delusions, hallucinations, morbid mood changes, suicidal ideation and any evidence of psychosis; however, she reported having to washing [sic] her hands at least 10 times a day. A mental statuts

examination revealed patently normal results.   Dr. Ritvo diagnosed the claimant with obsessive-compulsive neurosis due to her persistent symptoms of repetitive urgent hand washing.

The claimant continued treating with Dr. Simonian on a monthly basis for what appears to be medication management and sporadic cognitive psychotherapy.   Progress notes from 2009 reveal that while the claimant did report some depression as well as isolating herself from people, a majority of the appointments deal with her "medical condition" and the combination of medications she was prescribed for it (Exhibits 11F).   Additionally, despite reports of feeling sad, poor motivation and anxiety, the record reveal [sic] that no changes were made to the claimant's psychotropic medications since February 2009 (Exhibit 11F/4).   In fact, in March 2010, Dr. Simonian opined that the "present combination [of medication] has been more than helpful" (Exhibit 19F/2).   The undersigned also notes that prior to this appointment the claimant had not been seen by Dr. Simonian for 3 months. Therefore, although the claimant has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record reveals that the treatment has been generally successful in controlling those symptoms.

Despite the allegations of being unable to be around people and limitations preventing all work, the record reflects that the claimant went on a vacation since the

alleged onset date.  In July 2009, she was capable of going on vacation to Hawaii for approximately 12 days (Exhibit 22F/19). Although a vacation and a disability are not necessarily mutually exclusive, the claimant's decision to go on a vacation tends to suggest that the alleged symptoms and limitations may have been overstated.

The undersigned has also considered the claimant's work history in assessing her credibility in accordance with the Regulations (20 CFR 404.1529 and 416.929).  The evidence of record raises a question as to whether the claimant's unemployment since the alleged onset of disability was actually due to her medical condition.  Although she alleged that she had stopped working in approximately 1998 because she had become "disabled", the record is conspicuously devoid of corroborating medical evidence.   If the claimant did stop working due to serious problems in 1998 as alleged, then one might reasonably expect to see some evidence of medical treatment for those problems in or around that period.  Yet, a review of the record reveals that the claimant did not consistently seek medical attention for the allegedly disabling problem until 2008, two years after she stopped working.  Additionally, the claimant testified at the hearing that she was not able to work or even attempt to get a job except for a short period in 2006; however, in August 2008, the claimant reported to Dr. Simonian that she stopped taking her antidepressant medications in 2002 because she "felt better" (Exhibit 3F/5).

(AR 83-84).

After summarizing and assessing the opinion evidence in the record (see AR 84-86), the ALJ concluded:

> In reaching the conclusion as to the claimant's residual functional capacity, the undersigned finds that the claimant is credible to the extent she would experience some shortness of breath with exposure to fumes, odors, dusts, gases, poor ventilation, etc.  The residual functional capacity was accordingly reduced to accommodate those limitations.  However, the undersigned cannot find the claimant's allegations that she is incapable of all work activity to be credible because of significant inconsistencies in the record as a whole.

(AR 86).

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991).  Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her pain and symptoms only by articulating specific, clear and convincing reasons for doing so. Brown-Hunter v. Colvin, __ F.3d __, 2015 WL 4620123 *5 (August 5,

2015) (citing Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)); see also Smolen, supra; Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Here, substantial evidence supports the ALJ's finding that Plaintiff's testimony about the intensity, persistence and limiting effects of her symptoms was not fully credible.

The ALJ properly discredited Plaintiff's testimony about her symptoms and limitations because it was not supported by the objective medical evidence. See Burch v. Barnhart, 500 F.3d 676, 681 (9th Cir. 2005)("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects); Morgan v. Commissioner, 169 F.3d 595, 599-60 (9th Cir. 1999).

The ALJ properly found that Plaintiff's asthma symptoms were less serious than Plaintiff claimed or had been effectively treated. As the ALJ noted, the record reflects that, although on November 17, 2008, Plaintiff complained of more frequent asthma attacks and received treatment for her asthma (see AR 281 [Plaintiff was placed on steroids and advised to continue Albuterol and Advair and nebulizer therapy]), Plaintiff did not further complain about her asthma until April 10, 2009

14

(see AR 594), Plaintiff's medication appeared to fairly control Plaintiff's asthma (see AR 738-39 [Progress Note dated January 27, 2010, noting that Plaintiff was still taking Albuterol and Advair, and increased use of Albuterol was necessary for her asthma], 736 [Progress Note dated February 2, 2010, stating that Plaintiff's asthma is "often essentially asymptomatic"], and 734 [Progress Note date March 23, 2010, noting that Plaintiff's "[a]sthma [is] under good control"]), and Plaintiff was never hospitalized for her asthma attacks.  See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1008 (9th Cir. 2006)("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits.").

The ALJ also properly found that treatment, including medication, "had been generally successful in controlling [the] symptoms" caused by Plaintiff's mental condition.  As noted by the ALJ, the record reflects that: Plaintiff did not seek help with a mental health specialist (Stephan Simonian, M.D.) until August 6, 2008, at which time Plaintiff's mental exam was mostly unremarkable (i.e., Plaintiff was alert and oriented, there was no disorder of speech, thought process was coherent, there was no tangentiality or looseness of association, affect was full range and appropriate, there was no delusional thinking, hallucination, or suicidal or homicidal ideation, and intellectual function, memory for recent and remote events, comprehension, calculation and abstract thinking were intact and average) and Plaintiff was prescribed a mood stabilizer to be added to her previously prescribed antidepressants (see AR 318-20; see also AR 321 [Progress Note dated August 6, 2008, noting that "[g]enerally her condition seems stable"]); Plaintiff appeared to

15

be improving by October 2008 (see AR 322 [Progress Note dated October 6, 2008, noting that Plaintiff was "generally doing good" and that Plaintiff reported that "Abilify and Paxil are helpful"], 326-28 [In a Short-Form Evaluation for Mental Disorders, completed on October 27, 2008, Dr. Simonian, after noting inter alia that Plaintiff had normal speech, was cooperative, was oriented, had slightly distracted concentration, had normal memory, had dysphoric mood, had appropriate affect, had no hallucinations or illusions, and had goal directed associations and intact judgment, and was making "good" progress in treatment, stated that Plaintiff was "unlimited" in her ability to understand, remember, and carry out simple instructions, was "good" in her ability to understand, remember, and carry out complex instructions, and was "fair" in her abilities to maintain concentration, attention and persistence, to perform activities within a schedule and maintain regular attendance, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to respond appropriately to changes in a work setting]; and Plaintiff's mental health continued to improve though 2010 (see AR 322 [Progress Note dated November 14, 2008, noting that Plaintiff "[g]enerally manifests good affect and improvement of insight; Progress Note dated November 25, 2008, noting that "[g]enerally condition is stable], 376 [Progress Note dated December 8, 2008, noting that Plaintiff reported that Abilify "is helpful and keeps her anger and impulsive behavior in check"], 333-37 [In a report dated December 16, 2008, Edward Ritvo, M.D., a psychiatrist, stated that the results of the mental examination were unremarkable, diagnosed Plaintiff with obsessive-compulsive neurosis, and found that Plaintiff was not impaired in her abilities to understand, remember or complete simple commands or complex commands, to

16

interact appropriately with supervisors, coworkers or the public, to comply with job rules such as safety and attendance, to respond to change in the normal workplace setting, and to maintain persistence and pace in a normal workplace setting], 377 [Progress Note dated February 18, 2009, noting that Plaintiff reported that "present combination of medication seems to be better" (although she continues to complain of depression and feeling sad) and that Plaintiff "is complaining of her medical condition"; Progress Note dated March 3, 2009, noting that Plaintiff "is complaining of her medical condition" and of the "combination of medication that she is taking for her medical condition"], 716-17 [Progress Note dated March 22, 2010 (three months after her last visit), noting that the "present combination (of medication) has been more helpful"]).

To the extent that Plaintiff asserts that Plaintiff's symptoms continue despite her medications, as reflected in the Psychiatric/Psychological Impairment Questionnaire completed on October 12, 2011 by Fawzy Basta, M.D., a psychiatrist who purportedly treated Plaintiff from March 31, 2011 to May 12, 2011 (see Plaintiff's Brief at 7, citing AR 793-800)[3], Dr. Basta's statements about Plaintiff's continuing symptoms (see AR 794-95) are not supported by any objective medical evidence, such as a mental status examination. See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)(An ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical

---

[3]    Dr. Basta's Questionnaire was submitted to the Appeals Council at the time Plaintiff requested review of the ALJ's Decision. (See AR 17).

findings."); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001)(the ALJ properly discounted treating physician's opinion for being "so extreme as to be implausible" and "not supported by any findings" where there was "no indication in the record what the basis for these restrictions might be").  [[Moreover, it appears that treatment for Plaintiff's mental health was generally effective from March 22, 2010 (the date of Plaintiff's last treatment with Dr. Simonian, see AR 716) through March 31, 2011 (the date of Plaintiff's first treatment with Dr. Basta), since there are no records concerning Plaintiff's mental health treatment during that period.]]

The ALJ's finding that Plaintiff was able to travel to Hawaii for 12 days (see AR 84, citing AR 744) was a clear and convincing reason for discrediting Plaintiff's testimony.  See Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008)("[T]he ALJ doubted Tommasetti's testimony about the extent of his pain and limitations based on his ability to travel to Venezuela for an extended time to care for his sister.  The ALJ could properly infer from this fact that Tommasetti was not as physically limited as he purported to be.").  As the ALJ found, Plaintiff's ability to travel "tends to suggest that the alleged symptoms and limitations may have been overstated."  See Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012)("Even where those [daily activities] suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998)("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").  Moreover,

since Plaintiff's ability to travel was inconsistent with Plaintiff's testimony that she rarely goes outside and that she cannot be in crowded places or with crowds of people (see AR 57, 226, 229), it was a clear and convincing reason for discrediting Plaintiff's testimony. See Light v. Social Security Admin., 119 F.3d 789, 792 (9th Cir. 1997)("In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work history, and testimony from physicians and third parties concerning the nature, severity, and effect on the symptoms of which he complains.").

Even assuming the ALJ erred in discrediting Plaintiff's testimony because the ALJ overlooked, in her evaluation of Plaintiff's treatment and work history, the fact that Plaintiff had amended the onset date of disability to September 23, 2008 (see Plaintiff's Brief at 7-8), the Court finds any such error to be harmless. See Carmickle v. Commissioner, 533 F.3d 1155, 1162-63 (9th Cir. 2008)("So long as there remains 'substantial evidence supporting the ALJ's conclusion on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion,' such is deemed harmless and does not warrant reversal.")(citation omitted); Tommasetti, supra, 533 F.3d at 1038 (an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'"); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)("A decision of the ALJ will not be reversed for errors that are harmless."). The ALJ's error was harmless since, as discussed above, the ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony about her symptoms and limitations. See Carmickle, supra, 533

1  F.3d at 1162-63 (finding that the ALJ's error in giving two invalid
2  reasons for partially discrediting Plaintiff's testimony was harmless
3  where the ALJ gave valid reasons for partially discrediting Plaintiff's
4  testimony).

5

6  **B.    The ALJ Properly Rejected the Opinions of Plaintiff's Treating**
7  **Physicians**

8

9       Plaintiff asserts that the ALJ failed to provide specific and
10 legitimate reasons for rejecting the opinions of Plaintiff's treating
11 physicians, Drs. Lackman and Simonian. (Plaintiff's Brief at 3-7; Reply
12 at 1-3).  Defendant asserts that the ALJ provided proper reasons for
13 rejecting the opinions of Drs. Lackman and Simonian.  (Defendant's Brief
14 at 2-8).

15

16      Although a treating physician's opinion is generally afforded the
17 greatest weight in disability cases, it is not binding on an ALJ with
18 respect to the existence of an impairment or the ultimate determination
19 of disability.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190,
20 1195 (9th Cir. 2004); Magallanes v. Bowen, 812 F.2d 747, 751 (9th Cir.
21 1989).  The weight given a treating physician's opinion depends on
22 whether it is supported by sufficient medical data and is consistent
23 with other evidence in the record.  20 C.F.R. § 416.927(b)-(d).  If the
24 treating doctor's opinion is contradicted by another doctor, the ALJ
25 must provide "specific and legitimate reasons" for rejecting the
26 treating physician's opinion.  Orn v. Astrue, 495 F.3d 625, 632 (9th
27 Cir. 2007); Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998); Lester
28

1    v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)(as amended); Winans v.
2    Bowen, 853 F.2d 643, 647 (9th Cir. 1987).

4        As set forth below, the Court finds that the ALJ provided specific
5    and legitimate reasons for rejecting the opinions of Dr. Lackman and Dr.
6    Simonian about Plaintiff's limitations.

8        a.   Dr. Lackman

10       Vernon Lackman, M.D., a general practitioner at Facey Medical
11   Group, treated Plaintiff from October 19, 2009 to May 4, 2010. (See AR
12   727-43, 784).   In a Multiple Impairment Questionnaire completed on July
13   11, 2010, Dr. Lackman diagnosed Plaintiff with hypertension, asthma and
14   migraine headaches, which were based on the clinical findings of
15   persistent elevated blood pressure and wheezing on exam.   Dr. Lackman
16   opined that Plaintiff had the following functional limitations: could
17   sit and stand/walk 1 to 2 hours in an 8-hour workday; no limitations
18   with respect to lifting, carrying, grasping, using fingers/hands for
19   fine manipulations; Plaintiff's symptoms likely would increase if she
20   were placed in a competitive work environment; Plaintiff's condition
21   does not interfere with the ability to keep the neck in a constant
22   position; Plaintiff's experience of pain, fatigue and other symptoms are
23   periodically   severe   enough   to   interfere   with   attention   and
24   concentration; Plaintiff's anxiety and stress leads to elevated blood
25   pressure and possible asthma exacerbation; Plaintiff is incapable of
26   tolerating even low work stress; Plaintiff will have to take, possibly
27   on an hourly basis, unscheduled breaks to rest at unpredictable
28   intervals; Plaintiff likely would be absent from work more than three

times a month as a result of her impairments; Plaintiff is prone to infections due to asthma; and the other limitations that would affect Plaintiff's ability to work on a sustained basis are psychological limitations and the need to avoid fumes, gases, humidity and dust. (See AR 784-91).

After summarizing Dr. Lackman's opinion (see AR 84), the ALJ addressed Dr. Lackman's opinion as follows:

Although Dr. Lackman asserted treating the claimant for approximately seven months, his progress notes indicate he saw the claimant on one occasion in May 2010 (Exhibit 22F). Furthermore, the evidence does not support Dr. Lackman's assertion that the claimant cannot stand, sit or walk in combination for more than 2 hours. There are no x-rays indicating the presence of medically determinable musculoskeletal impairments and progress reports fail to indicate that the claimant suffers from any limitations as a result. Moreover, Dr. Lackman asserted the findings that supported his assessment to include persistent elevated blood pressure and wheezing on exam. As noted above, while a review of the claimant's blood pressure reveals she experienced a spike in January and May 2010 with readings of 150/99 and 141/98 respectively (Exhibit 22 F/3, 14), the remainder of readings from July 2009 through the present are normal (Exhibit 22F/11-23). In regards to the claimant's alleged wheezing, the most recent progress note in the record dated May 2010 reveals clear lung sounds and no complaints of

1    wheezing (Exhibit 22F/3).  Overall, Dr. Lackman's assessment
2    is inconsistent with the bulk of the evidence of record.

4  (AR 84-85).

6    Plaintiff correctly notes that the ALJ improperly stated that Dr.
7  Lackman's progress notes indicate he saw Plaintiff only once, in May
8  2010.  (See Plaintiff's Brief at 3).  The progress notes show that Dr.
9  Lackman saw Plaintiff on four occasions.  (See AR 741-43 [October 19,
10  2009], 736-37 [February 2, 2010], 734-35 [March 23, 2010], 727-28 [May
11  4, 2010]).

13    However, the ALJ's misstatement about the number of times Dr.
14  Lackman treated Plaintiff was insignificant.  The record reflects that
15  the ALJ discredited Dr. Lackman's opinion based on a consideration of
16  all of the progress notes concerning Plaintiff during that period
17  (October 2009 to May 2010), and that Dr. Lackman's opinion about
18  Plaintiff's limitations was inconsistent with the notations in his
19  progress notes.  See Valentine v. Commissioner Social Sec. Admin., 574
20  F.3d 685, 693 (9th Cir. 2009)(the ALJ's decision to reject the treating
21  physician's opinion, in part, since it was inconsistent with the
22  treating physician's own treatment notes was a specific and legitimate
23  reason supported by substantial evidence); Tommasetti v. Astrue, 533
24  F.3d 1035, 1041 (9th Cir. 2008)(an incongruity between a treating
25  physician's opinion and his or her medical records is a specific and
26  legitimate reason for rejecting the treating physician's opinion of a
27  claimant's limitations).

As the ALJ noted, Dr. Lackman improperly claimed that his diagnosis was supported by his finding of "persistent elevated blood pressure" (see AR 784).  Plaintiff did not have high blood pressure on every occasion she saw Dr. Lackman or prior to her visits with Dr. Lackman. (See e.g., AR 748 [July 1, 2009, blood pressure 118/88], 745 [August 12, 2009, blood pressure 110/70]; 742 [October 19, 2009, blood pressure 148/102], 739 [January 27, 2010, blood pressure 150/99], 737 [February 2, 2010, blood pressure 140/98], 735 [March 23, 2010 [March 23, 2010, blood pressure 128/98], and AR 728 [May 4, 2010, blood pressure 141/98]).

Moreover, as the ALJ noted, Dr. Lackman improperly claimed that his diagnosis was supported by his finding of "wheezing on exam" (AR 784). On May 4, 2010 (Plaintiff's last visit with Dr. Lackman), there is no indication that Plaintiff complained of wheezing and the examination showed that Plaintiff's "[l]ungs [were] clear with equal breath sounds." (See AR 727-28).  Moreover, on other occasions prior to and during the window of Plaintiff's treatment with Dr. Lackman, the physical exams revealed somewhat minimal issues with Plaintiff's wheezing. (See AR 748 [July 1, 2009, "Clear to ausculatation without wheezes, rales or rhonchi.  Good respiratory effort."], 745 [August 12, 2009, "Clear to auscultation.  Good respiratory effort."], 742 [October 19, 2009, "Lungs clear with equal breat[h] sounds."], 739 [January 27, 2010, "Clear to auscultation no crackles rhonci, slight wheezing."], and 737 [February 2, 2010, "Lungs with end expiratory wheezes, no ronchi or rales, equal breath sounds."]; 735 [March 23, 2010, "Lungs clear with equal breath sounds."]).

Although Plaintiff contends that the ALJ's assessment of Dr. Lackman's opinion was erroneous in light of earlier progress notes (prepared by other medical personnel at Facey Medical Group) containing notations about Plaintiff's wheezing and high blood pressure (see Plaintiff's Brief at 3-4 and Plaintiff' Reply at 2, citing AR 276 [November 24, 2008], 281 [November 17, 2008], 288 [September 15, 2008], 291 [July 2, 2008], 292 [April 29, 2008], 296 [April 17, 2008], 295 [April 18, 2008], 296 [April 16, 2008], 298 [April 11, 2008], 300 [April 24, 2008], 304 [March 14, 2008], 306 [January 8, 2008]), 620 [November 4, 2008], 642 [September 15, 2008], 673 [April 17, 2008], 678 [April 11, 2008], and 680 [March 24, 2008]), those treatment notes are irrelevant to the ALJ's evaluation of Dr. Lackman's opinion because those progress notes were completed long before Dr. Lackman's treatment of Plaintiff and there is no indication in the record that Dr. Lackman considered them.

Finally, it is not necessary for the Court to address whether the absence of x-rays of Plaintiff's musculoskeletal impairments was a specific and legitimate reason for discrediting Dr. Lackman's opinion about Plaintiff's abilities to stand, walk or sit (see Plaintiff's Brief at 4; Plaintiff's Reply at 2). Dr. Lackman's opinions about all of Plaintiff's limitations, including standing, walking and sitting, were based on his clinical findings of persistent high blood pressure and wheezing on exam. As discussed above, those findings were inconsistent with the notations in Dr. Lackman's progress notes.

///

///

///

b.   <u>Dr. Simonian</u>

Stephan Simonian, M.D., a psychiatrist, treated Plaintiff from August 6, 2008 to October 20, 2009.   (<u>See</u> AR 707, 716-18).   In a Psychiatric/Psychological Impairment Questionnaire completed on November 30, 2009, Dr. Simonian diagnosed Plaintiff with depression disorder and anxiety disorder, based on the following clinical findings: mood disturbance, emotional lability, recurrent panic attacks, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. (<u>See</u> AR 707-08).   When asked to identify the laboratory and diagnostic test results which support the diagnosis, Dr. Simonian stated, "Differed [sic]  to [Plaintiff's] general physician, however [Plaintiff] does not report any such abnormality."  (<u>See</u> AR 708). Dr. Simonian opined that Plaintiff had the following functional limitations: "moderately limited (significantly affects but does not totally preclude the individual's ability to perform the activity)" with respect to Plaintiff's abilities to remember locations and work-like procedures, to understand and remember one or two step instructions, and to understand and remember detailed instructions (Understanding and Memory), to carry out simple one or two step instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, to sustain ordinary routine without supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work related decisions, and to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods (Sustained Concentration and Persistence), to accept instructions and respond appropriately to criticism from supervisors, to get alone with co-workers or peers without distracting them or exhibiting behavioral extremes (Social Interactions), and to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel to unfamiliar places or use public transportation, and to set realistic goals or make plans independently (Adaptation); and no limitations with respect to Plaintiff's abilities to interact appropriately with the general public, to ask simple questions or request assistance, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (Social Interactions). (See AR 709-12). Dr. Simonian stated that under stressful situations Plaintiff might develop decompensation and an exacerbation of her symptoms. (See AR 712). Dr. Simonian opined that Plaintiff was capable of tolerating low and moderate work stress because Plaintiff has the "intellectual and effective stability to face low or moderate stress situations," and that Plaintiff is likely to be absent from work an average of about two to three times a month as a result of her impairments. (See AR 713-14).

After discussing Dr. Simonian's opinion (see AR 85), the ALJ wrote:

The undersigned affords the opinion of Dr. Simonian some weight. [¶] . . . The medical evidence contains treatment records from Dr. Simonian dating back to August 2008; however, his progress notes are relatively cursory and general. For

instance, a review of all treating notes from 2009 shows no evidence that any mental status examination was performed (Exhibits 11F and 19F). Additionally, Dr. Simonian has opined that the claimant suffers from certain limitations; however, his own progress reports fail to reveal the type of significant clinical abnormalities one would expect if the claimant did in fact have such limitations. For instance, while Dr. Simonian opined the claimant would likely be absent two to three times a month, he also concluded the claimant was capable of handling moderately stressful work situations. Furthermore, Dr. Simonian noted the claimant would have moderate difficulties in maintaining concentration and persistence while performing simple work-related tasks; however, he also asserted that the claimant had no "positive clinical findings" of difficulties in thinking or concentrating (Exhibit 18F/6). Moreover, he noted the claimant was capable of performing simple one to two step tasks. Given the lack of objective support, Dr. Simonian's assessments apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exists good reasons for questioning the reliability of the claimant's subjective complaints.

(AR 85-86).

Dr. Simonian's opinion about Plaintiff's limitations was inconsistent with the notations in his progress notes. See Valentine, supra, 574 F.3d at 693; Tommasetti, supra, 533 F.3d at 1041. As the ALJ noted, Dr. Simonian's progress notes fail to reflect the type of significant clinical abnormalities that would be expected if Plaintiff were functionally limited to the extent Dr. Simonian opined. On August 6, 2008 (Plaintiff's first visit with Dr. Simonian), Plaintiff's mental status exam was mostly unremarkable and Plaintiff's condition generally seemed to be stable. (See AR 318-21). On October 6, 2008 (Plaintiff's fifth or sixth visit with Dr. Simonian), Plaintiff was "generally doing good" and Plaintiff reported that "Abilify and Paxil are helpful". (See AR 321-22). On October 27, 2008, Plaintiff's mental status exam was mostly unremarkable. (See AR 326-28). Plaintiff's mental health generally continued to improve through the use of psychotropic medication through the rest of Dr. Simonian's treatment of Plaintiff. (See e.g., AR 322 [November 14, 2008, Plaintiff "[g]enerally manifests good affect and improvement of insight"], 322 [November 25, 2008, "Generally condition is stable"], 376 [December 8, 2008, Abilify "is helpful and keeps her anger and impulsive behavior in check"], 377 [February 18, 2009, Plaintiff reported that "present combination of medication seems to be better" (although she continues to complain of depression and feeling sad); 716-17 [March 22, 2010, the "present combination (of medication) has been more helpful"]).

Moreover, the ALJ properly rejected Dr. Simonian's opinion because of internal inconsistencies. As the ALJ noted, Dr. Simonian's opinion

that Plaintiff likely would be absent from work about two to three times a month (AR 714) was inconsistent with his opinion that Plaintiff was capable of tolerating moderate work stress (AR 713), and Dr. Simonian's opinion that Plaintiff was moderately limited in sustained concentration and persistent (AR 710-11) was inconsistent with his opinion that there were no clinical findings that Plaintiff had difficulty in thinking or concentration (AR 708).

In addition, the ALJ properly rejected Dr. Simonian's opinion based on Dr. Simonian's apparent reliance on Plaintiff's self-report of psychiatric symptoms and limitations which the ALJ properly discredited, as discussed above. See Tomasetti, supra, 533 F.3d at 1041 ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.")(citations omitted).

To the extent that Plaintiff is alleging that the ALJ's rejection of Dr. Simonian's opinion was erroneous because Dr. Basta (who diagnosed Plaintiff with bipolar disorder, general anxiety, and explosive disorder, and provided Plaintiff with even more functional limitations that Dr. Simonian, except for the missing work limitation, see AR 793-800) supported Dr. Simonian's opinion (see Plaintiff's Brief at 6; Plaintiff's Reply at 3), the Court has noted that Dr. Basta's opinion would not have been entitled to great weight. See page 17, n. 3.

Finally, the ALJ's rejection of Dr. Simonian's opinion based on the

opinion of the testifying medical expert, Betty Bourden, Ph.D. (see AR 86), was also a specific and legitimate reason based on substantial evidence.   See Thomas, supra ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings and evidence in the record."); Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989)("To the extent that other physicians' conflicting opinions rested on independent, objective findings, those opinions could constitute substantial evidence.").   As the ALJ found (AR 86), Dr. Bourden's testimony that Plaintiff should be limited to low stress work, and that Plaintiff has moderate difficulties in remembering and carrying out detailed instructions and in maintaining attention and concentration for extended periods of time, difficulty interacting with the public, and should be limited to brief and casual interactions with supervisors and co-workers (Plaintiff can do unskilled work with limited public contact)(see AR 45-46), is supported by the objective medical evidence, as discussed above.   Moreover, as the ALJ found (AR 86), the record also supports Dr. Bourden's testimony that Dr. Simonian's opinion that Plaintiff would likely miss 2 or 3 workdays a month was inconsistent with Dr. Simonian's finding that Plaintiff had only moderate limitations and had the ability to intellectually and effectively handle moderately stressful situations (see AR 47-48).

///

///

///

**ORDER**

For the foregoing reasons, the decision of the Commissioner is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: September 18, 2015

_____/s/_____
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE